T.C. Summary Opinion 2005-108


UNITED STATES TAX COURT



MAGELLEAN ASKEW, JR., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 1486-04S.               Filed August 1, 2005.


Magellean Askew, Jr., pro se.

<u>Beth A. Nunnink</u> and <u>Richard C. Grosenick</u>, for respondent.



ARMEN, <u>Special Trial Judge</u>:  This case was heard pursuant to

the provisions of section 7463 of the Internal Revenue Code in

effect at the time that the petition was filed.[1]  The decision to

---

[1]  Unless otherwise indicated, all subsequent section
references are to the Internal Revenue Code in effect for 2001,
the taxable year in issue, and all Rule references are to the Tax
Court Rules of Practice and Procedure.  All monetary amounts are
rounded to the nearest dollar.

be entered is not reviewable by any other court, and this opinion should not be cited as authority.

Respondent determined a deficiency in petitioner's Federal income tax for the taxable year 2001 of $6,758 and an accuracy-related penalty under section 6662(a) of $1,187.

The issues for decision are: (1) Whether petitioner received taxable distributions from his tax-sheltered annuity policies. We hold that he did. (2) Whether petitioner is liable under section 6662(a) for an accuracy-related penalty. We hold that he is.

Adjustments to petitioner's itemized deductions and child tax credit are purely computational matters, the resolution of which is dependent on our disposition of the first disputed issue.

### Background[2]

Some of the facts have been stipulated, and they are so found. We incorporate by reference the parties' stipulation of

---

[2] The evidence introduced at trial was incomprehensible. Accordingly, we calendared this case for further trial so that respondent could subpoena specific documentary evidence from Americo Financial Life and Annuity Insurance Co. (Americo) concerning the annuity policies at issue. At the subsequent trial, respondent produced several documents that respondent received pursuant to the subpoena. Although these documents were necessary to develop a part of the documentary record, the documents still failed to adequately describe the details of the annuity policies and the transactions that occurred during the life of the annuity policies. We thus are constrained to make factual findings on the basis of a limited evidentiary record.

facts and accompanying exhibits.

At the time that the petition was filed, petitioner resided in Memphis, Tennessee.

Petitioner has been employed as a teacher by Memphis City Schools continually since 1980. In 1985, petitioner became a participant in an employer-sponsored tax-sheltered account (TSA) group plan wherein he made biweekly pretax contributions by payroll deduction.[3] Initially, Lincoln Burnett Finance Co. administered the plan, but the company changed to Fidelity Finance Co., then to College Life Insurance Co. of America (College Life), and finally to Americo Financial Life and Annuity Insurance Co. (Americo). Under the plan, petitioner had the following annuity policies: (1) Policy No. 7142446 (first policy); (2) policy No. 7142859 (second policy); and (3) policy No. 7166534 (third policy).

Because of the changes in the TSA plan's underwriter, petitioner became concerned about the financial stability of his annuity policies. As a result, petitioner submitted to Americo in 2001 Surrender Request forms concerning his policies.

With regard to the first policy, petitioner submitted to Americo a Surrender Request form in late April or early May 2001 electing a full cash surrender of this policy because of a

---

[3] A TSA, also known as a sec. 403(b) retirement plan, is designed exclusively for employees of nonprofit institutions such as public schools. Sec. 403(b).

"separation from service". Under this option, the form stated that "any indebtedness thereon to the company will be deducted from the cash value." Petitioner elected, in the section entitled "Federal Income Tax Withholding Election for 'Non-Eligible Rollover Distributions'", not to have Federal income tax withheld from the taxable portion of his distribution check. In response, Americo sent petitioner a letter, dated May 18, 2001, requesting petitioner to: (1) Clarify whether he wanted a transfer or a direct distribution; (2) return the policy contract or submit written acknowledgment that the policy had been lost or destroyed; and (3) submit written acknowledgment of the reason or eligibility for a direct distribution under the Technical and Miscellaneous Revenue Act of 1988 (TAMRA, Pub. L. 100-647, 102 Stat. 3342) (the options listed were: Age 59-1/2; separation from service with employer; disability; and financial hardship as defined by the I.R.C.). On the letter, petitioner marked "separation from service with employer" and "financial hardship as defined by the I.R.C." and signed the letter on May 21, 2001. On June 7, 2001, petitioner submitted to Americo another Surrender Request form certifying that the policy had been lost or destroyed.

With regard to the second policy, and similarly with respect to the first policy, petitioner submitted to Americo a Surrender Request form electing a full cash surrender of this policy

because of a "separation from service" and electing not to have Federal income tax withheld from the taxable portion of his distribution check. In response, Americo sent petitioner a letter, dated May 9, 2001, requesting petitioner to: (1) Return the policy contract or submit written acknowledgment that the policy had been lost or destroyed, and (2) submit written acknowledgment of the reason or eligibility for a direct distribution under TAMRA. On the letter, petitioner marked "financial hardship as defined by the I.R.C." and signed the letter on May 14, 2001. Subsequently, Americo sent to petitioner another letter, dated May 25, 2001, again requesting petitioner to return the policy contract or submit written acknowledgment that the policy had been lost or destroyed. On May 30, 2001, petitioner signed the May 25, 2001 letter acknowledging that the policy contract had been lost or destroyed. On June 7, 2001, petitioner also signed the Surrender Request form certifying that the policy had been lost or destroyed.

With regard to the third policy, and similarly with respect to the first two policies, petitioner submitted to Americo a Surrender Request form signed June 2, 2001, electing a full cash surrender of this policy because of a "separation from service" and electing not to have Federal income tax withheld from the taxable portion of his distribution check. On June 7, 2001, petitioner sent to Americo another Surrender Request form

certifying that the policy had been lost or destroyed.

In June 2001, petitioner received checks in full settlement
of the current cash surrender value of each policy as follows:

| Account | Date Paid | Accumulated Cash Value | Loan Payoff Value | Cash Value[1] | Surrender Penalty | Net Distribution[2] |
|---------|-----------|------------------------|-------------------|---------------|-------------------|---------------------|
| 7142446 | Jun 11 | $12,434 | [3]$6,429 | $6,005 | $2,126 | $3,879 |
| 7142859 | Jun 26 | 10,590 | [4] 8,896 | 1,694 | 858 | 836 |
| 7166534 | Jun 11 | 4,700 | -0- | 4,700 | 592 | [5]3,286 |

[1] Cash value equals accumulated cash value less loan payoff value.
[2] Net distribution equals cash value less surrender penalty.
[3] On June 14, 1999, College Life sent petitioner a "loan check" of $4,711. Petitioner deposited this check into his wife's account at First South Credit Union (FSCU). Although petitioner claims that his wife's account is an annuity account, there is no evidence in the record to support his claim. Rather, based on the documents in the record, it appears that the account is a savings account.
[4] On June 7, 1999, College Life sent petitioner a "loan check" of $3,182. Petitioner deposited this check into his wife's account at FSCU.
[5] This computation includes a reduction for Federal income tax withheld of $822.

At the time of the distributions, petitioner was under 59-1/2
years of age, he was not disabled, and he had been employed with
Memphis City Schools continually since 1980.

Americo issued to petitioner three Forms 1099-R,
Distributions From Pensions, Annuities, Retirement or Profit-
Sharing Plans, IRAs, Insurance Contracts, etc., for 2001
reporting the following amounts as taxable distributions:

| Account | Distribution[1] | Withholding | Code |
|---------|-----------------|-------------|------|
| 7142446 | $10,308 | -0- | [2] 3 |
| 7142859 | 9,731 | -0- | 3 |
| 7166534 | 4,107 | $822 | [3] 2 |

[1] Distribution amount equals accumulated cash value less surrender penalty.
[2] Distribution code 3 is defined as a distribution on account of a disability, which is not subject to the 10-percent additional tax under sec. 72(t)(2)(A)(iii).
[3] Distribution code 2 is defined as an early distribution with an applicable exception from the 10-percent additional tax

under sec. 72(t).

Petitioner did not report these distributions on his Federal income tax return for 2001. In the notice of deficiency, respondent determined that petitioner failed to report the distributions from Americo of $24,146. Respondent further determined that petitioner is liable for the accuracy-related penalty under section 6662(a) for negligence and/or substantial understatement of income tax.

Petitioner filed a timely petition with this Court. Paragraph 4 of the petition states:

> The request is because-Funds from one IRA were placed into another IRA. These funds although reported to you on an 1099, were only transferred. I believe this request should be granted, I can provide paperwork supporting this claim.

## Discussion

### A. Americo Distributions

Generally, the Commissioner's determinations are presumed correct, and the taxpayer bears the burden of proving that those determinations are erroneous.[4] Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

---

[4] Sec. 7491(a) does not apply in this case to shift the burden of proof to respondent because petitioner neither alleged that sec. 7491(a) is applicable nor introduced credible evidence with respect to any factual issue relevant to ascertaining his income tax liability. See Higbee v. Commissioner, 116 T.C. 438, 442 (2001). Sec. 6201(d) also does not apply in this case if for no other reason than that petitioner failed to cooperate with respondent.

1.  Did petitioner receive the distributions at issue in 2001?

Petitioner first contends that he did not receive any distributions from Americo in 2001, and, therefore, the Forms 1099-R are incorrect.  Therefore, we first address whether petitioner received the distributions at issue in the taxable year 2001.

Petitioner denies receiving any distribution from Americo in 2001.  Instead, petitioner argues that he received distributions from his annuity policies only in 1999 in the following amounts:  (1) $4,711 from the first policy on June 14, 1999;[5] (2) $3,182 from the second policy on June 7, 1999; (3) $12,711; and (4) $9,000.[6]  The reason for these distributions, petitioner argues, is because he closed his TSA in 1999.  Petitioner further argues that these amounts were based on the surrender value of the policies at such time.  Petitioner's contention strains credulity.

Petitioner presented to the Court, inter alia, only copies of the checks in the amount of $4,711 and $3,182.  Remarkably, the supporting documentation attached to these checks

---

[5]  Petitioner testified at trial, however, that he received this amount in December 1998.  The check, dated June 14, 1999, clearly contradicts petitioner's assertion.

[6]  Petitioner presented no evidence of the latter two amounts that he claimed to have received from Americo in 1999.

specifically indicated that the disbursements were loans from petitioner's respective annuity policies.  Other than his bare assertions that he did not take any loans against the policies, petitioner presented no documentary evidence to demonstrate that the 1999 disbursements were anything other than loans against the policies.  Moreover, petitioner presented no evidence, aside from his self-serving statements, that he did not receive the distributions as reported in the Forms 1099-R for 2001.  See Tokarski v. Commissioner, 87 T.C. 74, 77 (1986) ("we are not required to accept the self-serving testimony of petitioner * * * as gospel").  Indeed, petitioner submitted signed Surrender Request forms for each policy in or about May and June 2001, the year in which he received the distributions at issue.  Pursuant to petitioner's Surrender Request forms, Americo distributed to petitioner the full cash surrender value of each annuity policy in June 2001.  Thereafter, Americo issued Forms 1099-R indicating such distributions.  Accordingly, we conclude that petitioner received a total distribution of $24,146 from Americo in 2001.

2.  Are the distributions at issue includable in petitioner's gross income?

As relevant to the instant case, annuities purchased by a tax-exempt educational organization for the benefit of its

teachers and other employees receive a special tax advantage.[7]
The amounts contributed to the annuity are excluded from the
employee's gross income at the time of the contribution, and
taxation is deferred until such time when the employee receives
payments under the annuity contract.  Sec. 403(b)(1).  The amount
actually distributed under such contract is taxable to the
distributee in the year in which he or she receives the payments
under the exclusion percentage rule of section 72.  Id.

Generally, a tax-sheltered annuity offered by a tax-exempt
organization will lose the section 403(b)(1) tax deferral
advantage unless, under such contract, distributions attributable
to contributions made pursuant to a salary reduction agreement
may be paid only:  (1) When the employee:  (a) attains age 59-
1/2; (b) separates from service; (c) dies; or (d) becomes
disabled; or (2) in the case of hardship.  Sec. 403(b)(11).  In
addition, an early distribution satisfying the aforementioned
requirements that is rolled over is not included in income in the
year so distributed if:  (1)  Any portion of the balance to the
credit of an employee in an annuity contract is paid to him in an
eligible rollover distribution (as defined in section 402(c)(4));
and (2) the employee transfers any portion of such property he
receives in such distribution to an eligible retirement plan (as

_____

[7]  This includes annuity contracts issued by an insurance
company.  Sec. 403(b)(1)(A).

defined in section 402(c)(8)(B)) within 60 days of receipt of the distributed property.  Sec. 403(b)(8).  Under section 402(c)(4)(C), an eligible rollover distribution specifically excludes any hardship distribution.  Moreover, an early withdrawal from a section 403(b) annuity contract that does not meet the aforementioned distribution requirements is subject to an early withdrawal penalty of 10 percent of the portion of such amount that is includable in gross income.[8]  Sec. 72(t)(1).

As relevant to this case, any amount that is received under an annuity contract on its complete surrender, which is not received as an annuity and is not subject to any other income tax law provision, shall be included in gross income to the extent it exceeds the investment in the contract.  Sec. 72(e)(1)(A), (5)(A), (E)(ii).  The investment in the contract is defined generally as the aggregate amount of premiums or other consideration paid for the contract less amounts previously received under the contract, to the extent such latter amounts were excludable from gross income.  Sec. 72(e)(6).

Petitioner contends that the distributions at issue are not includable in gross income because he rolled over the

---

[8]  An annuity contract under sec. 403(b) is a "qualified retirement plan" for purposes of sec. 72(t)(1).  See sec. 4974(c)(3).

distributions into an individual retirement account or annuity.[9] Petitioner's contention is misplaced.

In the instant case, petitioner did not satisfy the basic distribution requirements for an early distribution from a tax-sheltered annuity. Although petitioner indicated in his Separation Request forms that he separated from service, the truth of the matter is that he has been employed by Memphis City Schools continuously since 1980. Consequently, we find that petitioner did not have a separation from service to permit an early distribution. In addition, we question petitioner's statement with respect to his claim on his Separation Request forms for the first and second policy that the reason for the distribution was financial hardship. We question his statement for two reasons: (1) Petitioner has a history of falsifying the reasons for distribution under the plan (see discussion, supra); and (2) clearly, if petitioner was suffering from financial hardship, he would have used the distribution to relieve that financial burden rather than simply attempting to roll over tax-free the early withdrawal into a purported IRA or annuity. The

---

[9] The factual predicate for petitioner's contention is rather murky. Petitioner implies that he deposited the distributions into his annuity account with Aviva Life Insurance Co. (Aviva), which he opened in 2001. Petitioner, however, presented no documentary evidence, other than an Oct. 1, 2004 general account summary statement of his Aviva account, establishing that the distributions at issue were transferred to this account. This aspect, however, is not dispositive of the issue before us. See discussion, infra.

underlying reason petitioner surrendered his TSA, however, was because he was concerned about the financial stability of his policies due to the changes in the plan's underwriter rather than because of a personal financial hardship. In any event, assuming arguendo that petitioner suffered from a financial hardship, a hardship distribution from an annuity contract is specifically excluded as an eligible rollover contribution. Sec. 402(c)(4)(C).

On the basis of the entire record, petitioner did not satisfy the distribution requirements for an early withdrawal under section 403(b)(11), and, therefore, petitioner did not receive an eligible rollover distribution under section 403(b)(8). Accordingly, we conclude that petitioner did not make a tax-free rollover of the Americo distributions.[10]

The record is clear that the distributions at issue resulted from petitioner's surrender of his annuity policies. As stated earlier, section 72(e)(5) applies to the surrender of an annuity contract. See sec. 72(e)(5)(E). Absent exceptions not applicable in the instant case, the law is well settled that a distribution upon the complete surrender of an annuity contract is includable in gross income to the extent the distribution

---

[10] Based on our conclusion, petitioner should be liable for the sec. 72(t)(1) penalty. We note, however, that this issue is not before us because respondent did not challenge Americo's characterization that sec. 72(t)(1) did not apply.

- 14 -

exceeds the investment in the contract.[11]  Therefore, the
distribution of $24,146 is includable in petitioner's gross
income.  Accordingly, we sustain respondent's determination on
this issue.

B.    Section 6662(a) Penalty

In the notice of deficiency, respondent determined that
petitioner is liable under section 6662(a) for an underpayment of
tax that is attributable to negligence and/or substantial
understatement of income tax.

Section 6662(a) imposes a penalty equal to 20 percent of
any underpayment of tax that is attributable to either (1)
negligence or disregard of rules or regulations or (2) a
substantial understatement of income tax.  See sec. 6662(a) and
(b)(1) and (2).

The term "negligence" includes any failure to make a
reasonable attempt to comply with the provisions of the internal
revenue laws.  Sec. 6662(c); sec. 1.6662-3(b)(1), Income Tax
Regs.  The term "disregard" includes any careless, reckless, or
intentional disregard.  Sec. 6662(c); sec. 1.6662-3(b)(2), Income
Tax Regs.

---

[11]  Petitioner's annuity policies were tax-deferred
annuities, funded with pretax contributions.  Because the
contributions to petitioner's annuity policies were made with
pretax income, such contribution does not constitute an
investment in the contract within the meaning of sec. 72(e)(6).

An understatement of income tax is "substantial" if it exceeds the greater of 10 percent of the tax required to be shown on the return, or $5,000. Sec. 6662(d)(1)(A). An "understatement" is defined as the excess of the tax required to be shown on the return over the tax actually shown on the return. Sec. 6662(d)(2)(A).

Whether the accuracy-related penalty is applied because of negligence or disregard of rules or regulations, or a substantial understatement of tax, section 6664 provides an exception to imposition of the accuracy-related penalty if the taxpayer establishes that there was reasonable cause for the understatement and that the taxpayer acted in good faith with respect to that portion. Sec. 6664(c)(1); sec. 1.6664-4(b), Income Tax Regs. The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all the pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. Generally, the most important factor is the extent of the taxpayer's effort to assess the proper tax liability for such year. Id.

By virtue of section 7491(c), the Commissioner has the burden of production with respect to a taxpayer's liability for any penalty. To meet this burden, the Commissioner must produce sufficient evidence indicating that it is appropriate to impose the relevant penalty. Higbee v. Commissioner, 116 T.C. 438, 446

(2001).  Once the Commissioner meets the burden of production, the taxpayer must come forward with persuasive evidence that the Commissioner's determination is incorrect.  Id.  The taxpayer, however, bears the burden of proving that he or she acted with reasonable cause and in good faith.  See sec. 6664(c)(1); see also Higbee v. Commissioner, supra at 446; sec. 1.6664-4(b)(1), Income Tax Regs.

Respondent satisfied his burden of production under section 7491(a)(1) because the record demonstrates that petitioner failed to report annuity income in the amount of $24,146 and that the understatement was attributable to such unreported income, which was substantial within the meaning of section 6662(d)(1)(A)(ii).  Accordingly, we hold that respondent satisfied his burden of production for the accuracy-related penalty based on both negligence or disregard of rules or regulations and substantial understatement of income tax.

On the basis of the record, a prima facie case exists for imposition of the penalty.  Petitioner did not present any evidence or make any showing that respondent's determination was in error.  Moreover, petitioner did not have reasonable cause, nor did he act in good faith with respect to the understatement of income tax.  Accordingly, we sustain respondent's determination on this issue.

## Conclusion

We have considered all of the other arguments made by petitioner, and, to the extent that we have not specifically addressed them, we conclude that they are without merit.

Reviewed and adopted as the report of the Small Tax Case Division.

To reflect our disposition of the disputed issues,

<u>Decision will be entered</u>

<u>for respondent.</u>